Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL III

| JOSÉ DÍAZ LINAREZ<br><br>Apelante<br><br>v.<br><br>CP CORP.<br><br>Apelada | KLAN202400595 | Apelación Procedente del Tribunal de Primera Instancia, Sala de BAYAMÓN<br><br>Caso Núm.: BY2020CV02697<br><br>Sobre: Procedimiento Sumario bajo la Ley Núm. 2 de 17 de octubre de 1961 (Despido Injustificado) |
|---|---|---|

Panel integrado por su presidente el Juez Figueroa Cabán, el Juez Bonilla Ortiz, la Jueza Mateu Meléndez y la Jueza Prats Palerm.

Mateu Meléndez, Jueza Ponente

**SENTENCIA**

En San Juan, Puerto Rico, a 27 de agosto de 2024.

El 14 de junio de 2024, José Díaz Linares (en adelante, Díaz Linares o el apelante) compareció ante este Tribunal de Apelaciones mediante *Apelación* en la que nos solicita la revocación de la *Sentencia* emitida el 3 de junio del año en curso por el Tribunal de Primera Instancia, Sala Superior de Bayamón (en adelante, TPI o foro primario).[1] Por virtud del aludido dictamen, el TPI declaró No Ha Lugar la *Querella* por despido injustificado y discrimen por edad que el apelante presentó contra CP Corp. Inc.

Evaluado el expediente judicial, los documentos ahí contenidos, así como los argumentos planteados por las partes ante nuestra consideración, **confirmamos** el dictamen apelado. Veamos.

**-I-**

El 1 de septiembre de 2020, el apelante presentó la *Querella* que dio inicio al pleito de epígrafe. Allí, arguyó haber laborado para la parte apelada desde el 14 de agosto de 2007 hasta el 3 de septiembre de 2019,

---

[1] Esta, fue notificada al día siguiente.

cuando fue despedido injustificadamente. Señaló que, durante este periodo, aproximadamente para el mes de julio de 2016, la aparte apelada modificó los términos y las condiciones de su empleo de forma unilateral y en violación a la ley. Asimismo, alegó que su despido, además de injustificado, fue un pretexto para removerlo por razón de su edad, por lo que el mismo era ilegal y discriminatorio. Por todo esto, reclamó a modo de compensación la mesada e indemnización progresiva dispuesta en la Ley Núm. 80 del 30 de mayo de 1976, resarcimiento por los daños sufridos y salarios dejados de percibir, más una suma no menor del 25% por honorarios de abogado para cada causa.

El 14 de septiembre de 2020, la parte apelada contestó la demanda y solicitó se dictara sentencia sumaria a su favor. Así pues, negó todas las aseveraciones del apelante y afirmó que el despido del apelante fue uno justificado que fue provocado por la propia conducta y desempeño de éste. Específicamente, expuso que, debido a la mala actitud y el deficiente desempeño reflejado por el apelante, el cliente de la parte apelada a quien el apelante le brindaba servicio, solicitó su remoción. A su vez, manifestó que luego de esto, evaluó la razón por la cual se solicitó la remoción, así como la disponibilidad de puestos con la misma clasificación ocupación y perfil del apelante. Expuso que la falta cometida por el apelante y su deficiente desempeño, trastocaron la productividad del equipo, así como la imagen de la compañía ante su cliente, pues "ya en varias ocasiones había autorizado al supervisor directo del querellante, "Team Leader" de Telefónica en MAPFRE, Sr. Javier Berríos, que lo amonestara verbalmente por su actitud y desempeño con la intención de darle la oportunidad de corregir su actitud y desempeño."

Asimismo, la parte apelada en su escrito aseveró que pese a los esfuerzos realizados por ella para evitar que las situaciones con su cliente escalaran hasta el punto de que se solicitara su remoción y se afectara el

buen y normal funcionamiento de la empresa, con sus actuaciones, el apelante logró que ello pasara. Afirmativamente, también negó haber reemplazado al apelante con otro empleado más joven y aclaró que para evitar incumplir con los términos del contrato con su cliente, recurrió a una empresa de empleos temporeros para poder cumplir con el puesto que el apelante no cubriría, por su mala actitud y deficiente desempeño.

Tras exponer lo antes detallado, la parte apelada identificó los asuntos litigiosos que, a su entender, estaban en controversia, siendo estos los siguientes:

1. Alegación del apelante en cuanto a que fue despedido injustificadamente.

2. Alegación del apelante en cuanto a que fue despedido de su empleo discriminatoriamente por razón de su edad.

3. Alegación del apelante que en julio de 2016, CP modificó los términos y condiciones de su contrato de empleo unilateralmente y en violación a la Ley.

Asimismo, la parte apelada propuso cincuenta (50) hechos sobre los que, basándose en la documentación citada en apoyo, alegó que no existía controversia de hechos. En virtud de los hechos incontrovertidos propuestos, la parte apelada alegó haber sometido evidencia preponderante que rebate la presunción de despido injustificado y discrimen por edad que el apelante intentó establecer, por lo que debía dictarse sentencia sumaria a su favor y declararse No Ha Lugar la *Querella*.

Tras varios trámites procesales que no son necesarios detallar, en el caso se señaló la Conferencia con Antelación al Juicio. Según surge de la *Minuta* de tal audiencia, la parte apelada trajo a la atención del tribunal que el Sr. Javier Berríos, testigo anunciado, no había podido ser citado pues su patrono tiene reparos en que se introduzca al pleito, por lo que solicitó que fuera citado. Adicionalmente, solicitó al foro primario un término para poder enmendar su solicitud de sentencia sumaria. Este plazo fue concedido, estableciéndose similar término para que el apelante someta

oposición a la enmienda a sumaria. Así las cosas, el foro primario aceptó preliminarmente el Informe de Conferencia con Antelación al Juicio discutido en la audiencia.

El 25 de mayo de 2021, la parte apelada sometió *Contestación a Querella y Moción de Sentencia Sumaria Enmendada*. El 11 de julio de 2021, el apelante se opuso a dicho escrito. Al así hacer, señaló que un examen de la evidencia presentada en el caso demostraba que, contrario a lo alegado por la parte apelada, no hubo presente un patrón de incumplimiento por parte del querellante que justificara su despido. De igual manera, catalogó de tardía cierta evidencia incluida en la moción dispositiva, por no haber sido incluida en el Informe de Conferencia con Antelación a Juicio, por lo que era improcedente en derecho su consideración. Aun más, afirmó que los documentos que la parte apelada intentó tardíamente someter como prueba de las alegadas amonestaciones previas que hubo que darle, datan de fechas con al menos un año antes de que se le despidiera y eran insuficiente en derecho para sostener la justa causa que se alega para el despido.

El 14 de marzo de 2022, el TPI emitió *Resolución* en la que, al atender la moción dispositiva sometida por la parte apelada, estableció lo siguientes hechos incontrovertidos:

1. El querellante, José R. Díaz Linares, es mayor de edad, casado y vecino de Bayamón, Puerto Rico.

2. CP con Registro de Corporación número 64776, es una corporación doméstica, con fines de lucro, organizada al amparo de las leyes del Estado Libre Asociado de Puerto Rico, dedicada a prestar servicios variados, relacionados con sistemas de información, con dirección física 400, Avenida Américo Miranda, San Juan, Puerto Rico 00927.

3. El querellante, José Díaz Linares, comenzó a trabajar en CP, el 14 de agosto de 2007.

4. El querellante fue despedido de su trabajo en CP, el 3 de septiembre de 2019.

5. El querellante fue contratado por CP, el 14 de agosto de 2007, como "Especialista de Apoyo Técnico".

6. El querellante firmó un contrato de empleo probatorio con CP (antes Computer Paradise, Inc.), el 14 de agosto de 2007.

7. El contrato de empleo probatorio de 14 de agosto de 2007, expresa que el querellante devengaría un salario de $34,000, por año, entre otros beneficios.

8. El 9 de junio de 2011, el querellante acusó recibo del manual de empleados de CP.

9. El 4 de mayo de 2016, el querellante nuevamente acusó recibo del Manual de Empleados de CP.

10. El Sr. Alfredo Mena Carrión era Consultor de Soluciones de Sistemas de Información de CP para la fecha de los hechos y era quien manejaba la cuenta de Telefónica USA.

11. Las personas contacto entre CP y Telefónica, para la fecha de los hechos eran el Sr. Camilo Chaviano, SMC & Outsourcing Manager de Telefónica USA y el Sr. Javier Berríos, coordinador de técnicos de Telefónica USA destacado en MAPFRE.

12. El querellante siempre ocupó el mismo puesto en el mismo cliente de CP, Telefónica desempeñándose en MAPFRE.

13. La Sra. Virginia R. Scandroglio Estavillo, es empleada de CP y se desempeña como consultora de Soluciones de Sistemas de Información.

14. El manual de empleados de CP, notificado al querellante en dos ocasiones (2011 y 2016), recoge las políticas anti discrimen que rigen la empresa.

15. La Sra. Marisa Colón Berríos, es empleada de CP y ocupa el puesto de Chief Operations Officer.

16. El 31 de agosto de 2016, el querellante envió un mensaje de correo electrónico a la Sra. Marisa Colón Berríos de CP, en el cual reclamó que se le pagaran por enfermedad bajo la Ley 251 de 2015, tres días que había tomado durante la semana anterior que previamente le habían sido autorizados por vacaciones, para atender a su esposa que se encontraba de maternidad.

17. El 12 de febrero de 2009, el querellante le solicitó, mediante correo electrónico, al Gerente General de CP, Tomás Hernández, que se le diera de baja del beneficio de plan médico y que la aportación de la compañía de ese beneficio se le pagara como parte de su nómina, lo cual se le concedió.

De otra parte, el foro primario resolvió que existía controversia en cuanto a los siguientes hechos:

1. Si el despido del querellante fue injustificado. En la alternativa, si el alegado hecho que utiliza la parte querellada para justificar el despido no constituye una primera ofensa que amerite el despido de un empleado.

2. Si el despido del querellante fue discriminatorio y por razón de edad.

3. Si el contrato de empleo firmado entre las partes, el 3 de julio de 2016, es ilegal y nulo, al contravenir las disposiciones básicas de la Ley Núm. 80 de 30 de mayo de 1976, al pretender convertir

la relación de empleado del querellante, que para ese entonces era de carácter indeterminado, a una de alegado término cierto.

Debido a que el foro primario concluyó que existían controversias de hechos genuinas en el caso que, según su juicio, debían dilucidarse en una vista de juicio en su fondo, declaró No Ha Lugar la solicitud de sentencia sumaria de la parte apelada. En la misma fecha que así resolvió, ordenó a las partes a someter el Informe de Conferencia con Antelación al Juicio integrado. El 1 de abril de 2022, las partes dieron cumplimiento a esta orden. El 24 de mayo de 2022, se celebró la audiencia sobre Conferencia con Antelación al Juicio.

La Minuta que recoge los acontecimientos de tal audiencia revela que durante la vista el tribunal manifestó que surgía de las páginas 15 y 16 del informe sometido que las partes alcanzaron varias estipulaciones de hecho, que había otras adicionales, así como la prueba documental. Igualmente, se aprecia que en dicho momento la parte apelada solicitó la citación del Sr. Javier Berríos. El foro primario acogió el informe sometido por las partes, dejó pendiente de resolución la solicitud de citación y señaló las fechas para el Juicio en su Fondo para los días 25, 26, 27 de octubre de 2022.[2]

Llegado el día del juicio, surgió una controversia en cuanto a la prueba documental, puesto que el apelante solicitó la exclusión de las identificaciones que la parte apelada se proponía presentar, pues estas no fueron incluidas en el Informe sobre Conferencia con Antelación al Juicio. Mediante *Resolución* escrita, el 26 de octubre de 2022, el TPI resolvió permitir las identificaciones objetadas. Concluyó que, si bien era cierto que la solicitud de enmienda para presentar las identificaciones fue tardía, la prueba no era sorpresiva para el apelante, ni ocasionaría perjuicio a su reclamación.

---

[2] Es meritorio señalar que, posteriormente en el caso la citación al testigo Javier Berríos fue autorizada.

El Juicio en su Fondo se celebró el 9 y 10 de febrero de 2023, así como el 24 y 25 de mayo del mismo año. El 4 de junio del año en curso, la *Sentencia* apelada fue dictada. Allí recogió los hechos incontrovertidos ya decretados previamente en el pleito mediante *Resolución*, así como aquellos estipulados por las partes en el Informe de Conferencia con Antelación al Juicio. Por lo cual, y conforme a la prueba recibida durante la vista en su fondo, emitió las siguientes determinaciones de hechos:

1. El Sr. José R. Díaz Linares tiene 52 años, comenzó a trabajar en el año 2007 en CP como técnico de ayuda en nivel 1 cuando MAPFRE cierra el puesto. Dentro de las funciones que realizaba era atender las llamadas de los usuarios de la compañía para los problemas técnicos de la red, de teléfonos, y celulares a MAPFRE. CP es quien lo asigna a trabajar en MAPFRE.

2. El Querellante se reportaba al Sr. Javier Berríos, el cual era empleado de Telefónica, en MAPFRE donde brindaban los servicios de apoyo técnico. En CP Corp se reportaba para asuntos de personal a Marisa Colón ya fuera por correo electrónico o por teléfono.

3. El Sr. Javier Berríos asignaba las tareas diarias, le hablaba de los trabajos y se reunía con él.

4. El sistema de apoyo técnico en MAPFRE que ofrecía Telefónica mediante la subcontratación de CP era que al recibirse una llamada o solicitud de servicio en la plataforma, se asignaba un técnico por la Sra. Damaris a resolver el asunto requerido por el cliente. El técnico debía completar una "boleta" con el servicio requerido por la persona que cursó la llamada. Dependiendo del problema a atenderse, varía el tiempo de atención. Los asuntos se podían atender por teléfono, de forma remota o presencial. El técnico tenía que cerrar la "boleta", en otras palabras, documentar que ya se había atendido la solicitud de servicio al cliente y cuánto se había demorado.

5. Las solicitudes para reparación técnica que recibía eran de 15 a 20 semanal para completar las "boletas". De las que recibía el Querellante semanalmente trataba de cerrar la mitad. Algunos incidentes deberían atenderse en menos de 4 horas, otros en menos de 8 horas y los más complicados en menos de 16 horas. El supervisor Sr. Javier Berríos le decía que debía cerrar las boletas a tiempo, esto se lo comunicó en 5 o 8 ocasiones. El Querellante sabía que debía cerrar las boletas a tiempo y no dejarlo abierto indefinidamente. También conocía que CP Corp. podía ser penalizado por no cerrar las boletas y la compañía no pueda facturar por el servicio. En unas ocasiones le habían enviado un correo electrónico con un listado de boletas sin cerrar para ser completado y que se había excedido del tiempo dispuesto.

6. El 13 de diciembre de 2016 , doce (12) días después de la reunión sobre la cual versaba el mensaje descrito en el inciso anterior, el Sr. Javier Berríos envió un mensaje de correo electrónico única y directamente al querellante, Sr. José Díaz Linares, donde le

indicó que estuvo verificando y encontró que tenía boletos viejos y le pidió que los validara y resolviera al día siguiente. Además, le indicó que los que no pudiera resolver se los indicara para buscarle solución, pues, ya para el día siguiente los quería cerrados.

7. El 13 de febrero de 2017, el Sr. Javier Berríos envió otro mensaje de correo electrónico directamente al querellante, Sr. José Díaz Linares, donde le indicó que cerrara los boletos que ya había trabajado y que si tenía dudas con el proceso, que le dejara saber a él o a Damaris (refiriéndose a Damaris Mendoza Pantojas, quien aparece copiada en el mensaje y asiste con la asignación de boletos a los técnicos). Además, el Sr. Javier Berríos le indicó al querellante que ese día sacaría un reporte para "Diego" y que esto (refiriéndose nuevamente al cierre de los boletos) tenía que ser "el pan nuestro de cada día". El mensaje se trató de un seguimiento y oportunidad adicional al querellante para que corrigiera su deficiencia con los boletos de servicio que tenía asignados y que permanecían abiertos en el sistema.

8. El 26 de enero de 2018, el Sr. Javier Berríos envió un mensaje de correo electrónico directamente al querellante, Sr. José Díaz Linares, en el cual le informó sobre un boleto que debía trabajar al otro día a primera hora del día. En el mismo mensaje, el Sr. Berríos copió a la usuaria final a quien correspondía el servicio pendiente y le pidió disculpas por la tardanza en atender el problema y le indicó que el lunes sin falta se le resolvería el mismo. Es la propia usuaria final quien notifica al Sr. Javier Berríos que la solicitud de servicio no se había trabajado todavía.

9. El 8 de febrero de 2018, el Sr. Javier Berríos envió un mensaje de correo electrónico directamente al querellante, Sr. José Díaz Linares, 13 días después del mensaje descrito en el inciso anterior, en el cual le informó que debía validar lo informado por la usuaria final del boleto de servicio (mismo boleto del mensaje de 26 de enero de 2018), en cuanto a que el sistema le volvía a indicar que el servicio estaba cerrado, pero, que no habían podido utilizar la computadora. Por segunda ocasión el mismo servicio que había sido asignado al querellante, había sido cerrado por éste en el sistema, generando una notificación de alegada resolución al usuario final, sin que verdaderamente el servicio hubiese sido resuelto.

10. El 4 de mayo de 2018, la Sra. Damaris Mendoza, le envió al Sr. Javier Berríos un mensaje con una lista de boletos de servicios que habían sido asignados al querellante, Sr. José Díaz Linares, y que fue reenviado por el Sr. Javier Berríos al querellante, Sr. José Díaz Linares, el 7 de mayo de 2018 , indicándole que los revisara y cerrara los que ya se hubiesen trabajado. Le indicó, además, que validara los boletos más viejos y trabajara los mismos. En el mensaje aparecen listados 15 boletos sin cerrar en el periodo de aproximadamente un mes de trabajo, lo cual afectaba no solo las métricas de desempeño del grupo, si no que, también afectaba a los usuarios finales a los cuales no se les había atendido en ese periodo de tiempo.

11. El 13 de septiembre de 2018, el Sr. Javier Berríos envió otro mensaje directamente al querellante donde hizo referencia a otro boleto que había excedido el 100% del tiempo de resolución. Además, de indicarle al querellante que lo trabajara,

lo apercibió que por "estos" boletos los iban a penalizar, refiriéndose a que Telefónica iba a ser penalizado por MAPFRE.

12. El 30 de octubre de 2018,27 el Sr. Javier Berríos envió un mensaje directamente al querellante, donde le incluyó la invitación a una reunión con el propósito de discutir varios temas, entre los cuales listó los siguientes: "(1) Boletos, (2) Ayuda a los compañeros, (3) Ayuda con las llamadas, (4) Proactividad, (5) Uso de Internet, (6) Seguir instrucciones, (7) Otros". La reunión fue una de varias de las reuniones del Sr, Javier Berríos con el querellante para apercibirlo y darle la oportunidad de corregir sus faltas y su desempeño.

13. Los técnicos se dividían en tres niveles. El nivel uno atendía los problemas más sencillos, el nivel dos atendía lo relacionado a programación y en el nivel tres implementaba soluciones. La diferencia en los niveles es por experiencia y las certificaciones técnicas que hayan obtenido, según explicó el Sr. Tomás Hernández Solá, Gerente General.

14. El Sr. Almena se comunica con el Querellante y le informa que acuda el 3 de septiembre de 2019 a las oficinas de CP. El 3 de septiembre de 2019 llega a las oficinas de CP, esperó en el lobby y lo llama la Lic. Estrada quien estaba junto al Sr. Héctor Jiménez de Finanzas de CP. Cuando está en la oficina le informan que estaba despedido porque habían recibido notificación para removerlo del proyecto de MAPFRE por problemas de desempeño y de actitud. El Querellante se sorprendió cuando le informaron de su despido, que llevaba 12 años laborando sin medidas disciplinarias. Además, solicitó si había la oportunidad de reubicarlo en una plaza de la compañía, el aceptaba un descenso. Le informaron que al momento no tenían plazas, que lo consultarían a ver si lo podían reubicar.

15. Las quejas realizadas por el cliente MAPFRE era que si no le daban tareas no pedía trabajo, que no era proactivo, los cierres de las boletas para las encomiendas de trabajo no las realizaba a tiempo.

16. Posterior al despido, el Querellante buscó trabajo con unas amistades. A los tres meses consiguió un trabajo a tiempo parcial en Puerto Rico Medical Defense como soporte técnico. Laboró a tiempo parcial para poder cuidar a su hijo. El salario es a razón de $22 la hora por un mínimo de 5 horas. Estuvo laborando casi tres años en ese lugar, hasta el año 2022. El sueldo anual era $29,000.

17. En la compañía CP el Querellante devengaba un salario de $36,000 al año.

18. Posterior al despido el Querellante solicitó el desempleo el cual fue aprobado por tres meses a razón de $240 semanal.

19. El Querellante nunca hizo queja de discrimen dentro de la compañía. La Sra. Marisa Colón Berríos confirmó la misma información.

20. Las personas que ocupan los siete puestos de técnicos en la compañía tienen las siguientes edades: 52 años, 41 años, 59 años, 46 años, 53 años, 47 años y 50 años. Cuando se le inquirió

al Querellante si había sido sustituido por un empleado más joven y quién era este contestó que no sabía. No le consta quién ocupó el puesto de él en MAPFRE.

21. La Sra. Marisa Colón Berríos llenó la solicitud de desempleo del Querellante. Esta declaró que MAPFRE pidió la remoción del Querellante por su desempeño. En cuanto al formulario del desempleo esta informó que aparece como "escasez de trabajo" ya que si colocara la razón de desempeño afectaría al empleado.

22. La Sra. Virginia Scandrovilio declaró que la supervisión directa diaria de los técnicos de apoyo recae en el cliente, en el caso del Querellante en el Sr. José Berrios en MAPFRE. Sí hay supervisión de CP Corp. en el manejo de vacaciones, en la distribución de recursos y reuniones presenciales o por teléfono para discutir con los clientes el desempeño de los empleados de CP Corp. En cuanto al trabajo diario la amonestación la da el supervisor del cliente quien está día a día con el empleado de CP.

23. Cuando hay quejas de un empleado por desempeño, en primer lugar verifican si existe otro lugar dónde ubicarlo o si es por conducta definitivamente no se puede poner con otro cliente, declaró la Sra. Scandrovilio. En cuanto al Sr. Díaz Linares declaró que se llegó a investigar otros proyectos de la compañía donde fuera necesario un técnico 1 pero las plazas ya estaban cubiertas.

En virtud de todos estos hechos el TPI resolvió que el despido del apelante fue justificado, por lo que declaró No Ha Lugar Querella y ordenó el cierre y archivo del caso con perjuicio. Inconforme, el apelante sometió el recurso de epígrafe y señaló la comisión de los siguientes tres (3) errores:

1. PRIMER ERROR: ERR[Ó] EL TPI AL PERMITIR QUE LA PARTE APELADA QUERELLADA ENMENDARA SU CONTESTACI[Ó]N A QUERELLA PARA JUSTIFICAR QUE EL DESPIDO DEL APELANTE FUE PRODUCTO DE UN PATR[O]N DE CONDUCTA REITERADO, A PESAR DE QUE EN SU CONTESTACI[Ó]N A QUERELLA Y MOCI[Ó]N DE SENTENCIA SUMARIA ALEG[Ó] QUE LA RAZ[Ó]N DEL DESPIDO OBEDECI[Ó] A REPRIMENDAS VERBALES AUTORIZADAS POR CP CORP Y A SOLICITUD DE REMOCI[Ó]N DEL CLIENTE.

2. SEGUNDO ERROR: DETERMINAR QUE EL DESPIDO FUE JUSTIFICADO CONFORME A LA ALEGADA DISCIPLINA PROGRESIVA, A PESAR DE QUE LA EVIDENCIA PRESENTADA DEMOSTR[Ó] QUE EL APELANTE NO FUE DISCIPLINADO CONFORME AL MANUAL DE EMPLEADOS DE CP [CORP.]

3. TERCER ERROR: DETERMINAR QUE LOS CORREOS ELECTR[Ó]NICOS DEL SUPERVISOR DE DÍAZ CONSTITUYEN MEDIDAS DISCIPLINARIAS QUE AMERITABAN EL DESPIDO, A PESAR DE QUE EL [Ú]LTIMO

CORREO ELECTR[Ó]NICO FUE DADO UN (1) AÑO ANTES DEL DESPIDO, LO CUAL NO JUSTIFICA EL DESPIDO DEL APELANTE EN CONTRAVENCI[Ó]N A LO DISPUESTO EN LA LEY 80 DE 1976 Y LA JURISPRUDENCIA INTERPRETATIVA.

Atendido el recurso, el 21 de junio de 2024, establecimos el plazo disponible para que la parte apelada presentara su posición. El 29 de junio de este año, en cumplimiento con lo ordenado sometió *Alegato de la Parte Apelada.*

-II-

*A.*

La Ley de Indemnización por Despido sin Justa Causa, Ley Núm. 80 del 30 de mayo de 1976, *supra*, ofrece una valiosa protección a aquellos individuos empleados y contratados por tiempo indeterminado a ser remunerados de ser despedidos injustificadamente de su trabajo. Este resarcimiento se conoce comúnmente como "mesada". León Torres v. Rivera Lebrón, 204 DPR 20 (2020), citando a González Méndez v. Acción Social et al., 196 DPR 213 (2016) y otros allí citados.

La Ley 80 no establece qué constituye un despido injustificado. No obstante, el aludido estatuto informa sobre varios escenarios que pueden liberar al patrono de responsabilidad. Así pues, se reputará justa causa para el despido si el empleado: (1) ha exhibido un patrón de conducta impropia o desordenada; (2) no ha cumplido con sus labores de manera eficiente, ha realizado su trabajo tarde o negligentemente o en violación a las normas aplicables, o (3) ha violado reiteradamente aquellas reglas y reglamentos razonablemente establecidos para la operación del establecimiento y los cuales le han sido suministrados oportunamente. Id. De igual forma, se entenderá que el despido fue justificado si sucede a consecuencia de: el cierre total, temporero o parcial de las operaciones del establecimiento; los cambios tecnológicos o de reorganización, así como los de estilo, diseño o naturaleza del producto que se produce o maneja por el establecimiento y

los cambios en los servicios rendidos al público; o reducciones en empleo necesarias debido a una reducción en el volumen de producción, ventas o ganancias, anticipadas o que prevalecen al ocurrir el despido o con el propósito de aumentar la competitividad o productividad del establecimiento. 29 LPRA Sec. 185b.

Aun así, es importante recordar que las circunstancias representativas de justa causa enumeradas en el discutido estatuto son meros ejemplos de acontecimientos asociados a un despido. Ello así, ya que este no puede prever el universo de incidencias que pueden surgir en un entorno laboral y que desemboquen en la cesantía de un empleado. León Torres v. Rivera Lebrón, *supra*, citando a SLG Torres Matundan v. Centro Patología, 193 DPR 920 (2015).

*B.*

La Ley Núm. 2 del 17 de octubre de 1961, 32 LPRA 3118 *et seq.*, en adelante Ley 2, instituye un mecanismo sumario para lograr "la rápida consideración y adjudicación de las querellas presentadas por los obreros o empleados, principalmente en casos de reclamaciones salariales y beneficios." Santiago Ortiz v. Real Legacy et al., 206 DPR 194 (2021); Medina Nazario v. McNeil Healthcare LLC, 194 DPR 723, 732 (2014). Acorde con la normativa imperante, el carácter acelerado del proceso es la médula del estatuto. Bacardí Corp. v. Torres Arroyo, 202 DPR 1014, 1019 (2019); Ruiz Camilo v. Trafon Group, Inc., 200 DPR 254, 265 (2018).

Mediante esta herramienta expedita, la Asamblea Legislativa creó las siguientes limitaciones procesales:

(1) términos cortos para la contestación de la querella presentada por el obrero o empleado;

(2) criterios para la concesión de una sola prórroga para contestar la querella;

(3) un mecanismo para el emplazamiento del patrono querellado;

(4) el procedimiento para presentar defensas y objeciones;

(5) criterios para la aplicación de las Reglas de Procedimiento Civil;

(6) **una limitación específica sobre el uso de los mecanismos de descubrimiento de prueba**;

(7) una prohibición específica de demandas o reconvenciones contra el obrero o empleado querellante;

(8) la facultad del tribunal para dictar sentencia en rebeldía cuando el patrono querellado no cumpla con los términos provistos para contestar la querella; y

(9) los mecanismos para la revisión y ejecución de las sentencias y el embargo preventivo. Medina Nazario v. McNeil Healthcare LLC, supra, pág. 732; Rivera v. Insular Wire Products Corp., 140 DPR 912, 923-924 (1996). (énfasis nuestro)

El aludido componente parlamentario también reguló a través de la Sec. 3 de la Ley 2, 32 LPRA sec. 3120, la manera en que las partes y el tribunal deben proceder durante la tramitación del proceso laboral sumario. Vizcarrondo Morales v. MVM, Inc., 174 DPR 921, 930 (2008). De modo tal, que el legislador delimitó por medio de ese precepto legal "el alcance de la autoridad de los tribunales." *Íd.*

C.

En nuestro ordenamiento jurídico es norma firmemente establecida que, ante la ausencia de error manifiesto,[3] prejuicio, parcialidad o pasión, no se favorece la intervención de los tribunales apelativos en la apreciación de la prueba, la adjudicación de credibilidad o las determinaciones de hechos formuladas por el Tribunal de Primera Instancia. Pena Rivera v. Pacheco Caraballo, 2024 TSPR 48, al citar a Ortiz Ortiz v. Medtronic, 209 DPR 759, 778 (2022) y otros. La tarea de adjudicar credibilidad y determinar lo que realmente ocurrió en un caso depende en gran medida de la exposición del juez o la jueza a la prueba presentada; trabajo que, en esencia, se realiza en el foro primario. *Íd.*

Así pues, "nuestro esquema probatorio está revestido por un manto de deferencia hacia las determinaciones que realizan los juzgadores de

---

[3] Hay presente error manifiesto, cuando el foro apelativo queda convencido de que existe un conflicto entre las conclusiones a las que llegó el Tribunal de Primera Instancia y el balance más racional, justiciero y jurídico de la totalidad de la evidencia recibida.

primera instancia en cuanto a la prueba testifical que se presenta ante ello." Pueblo v. Arlequin Vélez, 204 DPR 117, 146-147 (2020). A manera de excepción, los tribunales apelativos intervendremos con las determinaciones emitidas por el foro primario cuando se pruebe que dicho foro actuó con prejuicio o parcialidad, incurrió en craso abuso de discreción, o que incurrió en error manifiesto, y que la intervención en esa etapa evitaría un perjuicio sustancial a la parte afectada por su determinación. BPPR v. SLG Gómez-López, 2023 TSPR 145, 213 DPR \_\_\_\_ (2023).

-III-

Tal como surge de la exposición narrativa del tracto procesal detallada en el acápite I de esta *Sentencia*, el apelante señaló la comisión de 3 errores. Al discutir el primero de estos, expone que en la contestación y moción de sentencia sumaria que CP presentó originalmente, alegó que las razones del despido obedecieron a unas reprimendas verbales impartidas a Díaz y a solicitud de remoción del cliente. Por otra parte, señala que la enmienda a la alegación responsiva y moción dispositiva sometida posteriormente en el caso por CP tuvo el propósito de incluir una defensa afirmativa nueva basada en un "patrón de conducta escrito producto de unos correos electrónicos del Sr. Javier Berríos, lo cual justificada el despido de Díaz previo la solicitud de remoción del cliente". El apelante, prosigue entonces a exponer que la enmienda autorizada es una violación a las disposiciones de la Ley Núm. 2, pues lo añadido mediante enmienda era algo que el patrono conocía o debió conocer desde un inicio, debiéndolo incluir al contestar la *Querella*.

De otra parte, al discutir de forma conjunta su segundo y tercer error, cuestiona la apreciación efectuada por el foro primario de la prueba recibida. Con ese propósito, en su discusión expone que los correos electrónicos que CP presentó como evidencia para justificar su despido, comprenden un periodo de tiempo con un año previo al despido, por lo que

fue errado concluir que estos justificaban su cesantía. También argumenta que de las determinaciones de hecho no se desprende que se le hubiera impartido disciplina escrita, pues el récord está desprovisto de prueba que demuestre que las alegadas quejas que el foro primario determinó ocurrieron, hayan sido documentadas por escrito.

Además de los planteamientos arriba plasmados, para atacar la sentencia emitida en el caso, el apelante argumenta lo siguiente:

> En su Sentencia al juzgador le mereció credibilidad el testimonio de la Sra. Marisa Colón Berríos, empleada de CP Corp., **quien al ser confrontada durante el contrainterrogatorio con prueba de impugnación sobre la solicitud de desempleo completada por CP Corp., el propio patrono completó el formulario indicando la razón del despido como "escasez de trabajo" ya que si colocaba la razón de desempeño afectaría al empleado.** Sin embargo, el propio juzgador omitió que la misma solicitud de desempleo establece que CP Corp había informado que *Díez nunca había sido amonestado por escrito, conducta consistente con su alegación responsiva dada en su Contestación a Querella y Moción de Sentencia Sumaria*.
> […]
>
> Si bien es cierto que [en] la Sentencia el TPI concluye que Díaz fue amonestado mediante unos correos electrónicos, los cuales justifican el alegado patrón de conducta, la evidencia demuestra que su último incidente con su supervisor ocurrió el 30 de octubre de 2018, un (1) año antes de su despido. Sostenemos que, como cuestión de derecho, el TPI cometió error manifiesto ya que el patrono no pudo demostrar el patrón de conducta que requiere nuestro ordenamiento jurídico para justificar el despido de un empleado. Como regla general, un patrón de incumplimiento con las normas aprobadas por el patrono para el funcionamiento de la empresa cualifica como "justa causa" para el despido de un empleado. Rivera v. Pan Pepín, supra, pág. 690 (2004).
>
> El TPI cometió error manifiesto al concluir que CP Corp demostró la justa causa del despido como resultado de un patrón de conducta, cuando se desprende de la propia evidencia en el récord que el último incidente por escrito ocurrió un (1) [*sic*] antes del despido del apelante. Ello a pesar de que en la Sentencia el TPI determinó que CP Corp había llenado una solicitud de desempleo, cuya razón para el despido fue "escasez de trabajo" y donde aparece que Díaz nunca había sido disciplinado.
>
> […]
>
> En primer lugar, la conclusión del juzgador no se sostiene a base de las determinaciones de hecho realizadas por el foro primario. En ningún momento el juzgador estableció que cercano a la fecha de su despido, había faltado a las normas establecidas en el manual de empleados de CP. La evidencia presentada demuestra que el último incidente por escrito data del 30 de octubre de 2018. Nótese que el propio tribunal cita con autoridad al tratadista Santiago, quien establece que debe entenderse que cuando el patrono alega haber amonestado verbalmente a un empelado y éste último niega haber recibido tal amonestación, surge una presunción controvertible que favorece la posición del empleado. Por lo tanto,

si el patrono desea tener prueba fehaciente de la amonestación debe hacerlo por escrito y pedirle al empleado que firme cada amonestación. En este caso nunca ocurrió.

En segundo lugar, el TPI cometió error manifiesto cuando concluye que el Sr. Alfredo Mena Carrión, había intervenido autorizando que el Sr. Javier Berríos de Telefónica en MAPFRE, le amonestara verbalmente, intentando que se corrigiera la situación en cuanto a la actitud del querellante con los usuarios finales en MAPFRE y en cuanto a su desempeño deficiente para tratar de evitar que las situaciones en el cliente de Telefónica, MAPFRE, escalaran hasta el punto en que solicitaran su remoción y evitar que se afectara el buen y normal funcionamiento de la compañía CP. Según demuestra el récord, aunque el Sr. Mena fue anunciado como testigo de CP Corp, el patrono renunció a su derecho a que testificara como testigo, por lo que el foro primario cometió error manifiesto cuando concluye que el Sr. Mena había autorizado al Sr. Berríos amonestar verbalmente a Díaz.

En tercer lugar, el foro primario cometió error manifiesto cuando determina responsabilidad a Díaz que el buen y normal funcionamiento de CP se haya afectado producto de la remoción, cuando quien provocó esta situación fue el propio cliente que solicitara la remoción, por lo cual CP Corp. para mantener la relación comercial no tuvo otra opción que acatar la decisión.

El TPI cometió error manifiesto a base de la prueba testifical y documental y por preponderancia de la prueba que el despido de Díaz fue injustificado a base de un patrón de conducta reiterado, cuando la propia evidencia demuestra que Díaz nunca fue disciplinado o amonestado desde el 30 de octubre de 2018 hasta la fecha de su despido en septiembre de 2019. La verdadera razón del despido obedeció a la solicitud de remoción del cliente; no a la disciplina progresiva impartida por su patrono CP Corp. la determinación de que alegadamente se haya afectado el buen y normal funcionamiento de la empresa es únicamente atribuible al cliente, con quien CP Corp mantenía una relación comercial. A base de la evidencia presentada y las determinaciones de hecho del foro primario, el patrono no demostró que el despido fuera justificado.

Tras estudiar minuciosamente la *Contestación a Querella y Moción de Sentencia Sumaria* sometida por CP, su posterior enmienda, discrepamos con la alegación levantada por el apelante en su primer señalamiento de error. Contrario a lo que allí señala, la *Contestación a Querella y Moción de Sentencia Sumaria Enmendada* autorizada, no tuvo el efecto de introducir una defensa afirmativa que no hubiera sido levantada en la alegación responsiva original. La enmienda sometida por CP, tuvo el propósito de describir en mayor detalles los hechos ya levantados por la parte apelada a los fines de demostrar que el despido del apelante fue justificado. Para ello, por ejemplo, se hizo referencia a porciones específicas de la deposición del apelante tomada en el caso. Mas aún, conforme surge de la *Resolución* que

autorizó la enmienda, el tribunal permitió que CP sometiera enmienda **a su moción de sentencia sumaria**- la que, había sido sometida en conjunto con su alegación responsiva. Un patrono no está permitido de enmendar su contestación a la querella excepto en aquellas situaciones en que la enmienda sirva para clarificar o ampliar una defensa afirmativa previamente interpuesta. León Torres v. Rivera Lebrón, *supra* al citar a Srio. del Trabajo v. JC Penney Co. Inc., 119 DPR 660 (1987). Por consiguiente, el primer error no fue cometido.

Igual conclusión alcanzamos en cuanto al restante de los errores señalados. Esto, pues el apelante no colocó a este Tribunal en posición de ejercer un juicio razonable sobre la prueba que se desfiló durante el juicio en su fondo llevado en el caso **al no haber solicitado autorización ni presentado ante nuestra consideración una transcripción o exposición narrativa de la prueba oral vertida.** Ante este hecho, nos es forzoso alcanzar tal conclusión.

Al final de cuentas, "[e]n consideración a la norma de corrección que cobija a las determinaciones realizadas por el Tribunal de Primera Instancia, cuando un peticionario señala errores dirigidos a cuestionar la apreciación o suficiencia de la prueba, la naturaleza del derecho apelativo requiere que este ubique al foro revisor en tiempo y espacio de lo ocurrido en el foro primario utilizando alguno de los mecanismos de recopilación de prueba oral, como son: (1) transcripción de la prueba, (2) exposición estipulada, o (3) exposición narrativa. Los tribunales de mayor jerarquía no pueden cumplir a cabalidad su función revisora sin que se le produzca, mediante alguno de estos mecanismos, la prueba que tuvo ante sí el foro primario." Pueblo v. Pérez Delgado, 211 DPR 654 (2023).

La ausencia de una transcripción del juicio en su fondo celebrado nos impide pasar juicio sobre la apreciación de prueba efectuada por el foro primario. Por consiguiente, al no poder cumplir a cabalidad con nuestra

función revisora, pues el apelante no rebatió la presunción de validez y corrección de la decisión judicial alcanzada luego de valor los testimonios vertidos en sala, nos resta sólo brindarle deferencia a lo resuelto por el TPI.

-IV-

Por los fundamentos antes esbozados, se confirma la *Sentencia* emitida el 3 de junio del 2024 por el Tribunal de Primera Instancia, Sala Superior de Bayamón, en la causa de epígrafe.

Lo acordó y manda el Tribunal, y lo certifica la Secretaria del Tribunal.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelacciones